*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

---

ROBERT CLEVELAND, an individual,

*Plaintiff-Appellant,*

v.

THE BEHEMOTH, a California corporation,

*Defendant-Appellee.*

---

*Appeal from a Decision of the United States District Court for the Southern District of California,*
*No. 3:19-cv-00672-RBM-BGS · Honorable Ruth Bermudez Montenegro*

## APPELLANT'S CONSOLIDATED OPENING BRIEF

FRANK J. JOHNSON, ESQ.
KRISTEN O'CONNOR, ESQ.
JOHNSON FISTEL, LLP
501 West Broadway, Suite 800
San Diego, California 92101
(619) 230-0063 Telephone
(619) 255-1856 Facsimile
frankj@johnsonfistel.com
kristeno@johnsonfistel.com

*Attorneys for Appellant,*
*Robert Cleveland*

 

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................1

II.  STATEMENT OF JURISDICTION ..............................................3

III. STATEMENT OF ISSUES ..........................................................4

IV.  STATEMENT OF THE CASE .....................................................6

    A.   Relevant Factual Background ..............................................6

    B.   Appellant's First Pretrial Objection to Prejudicial Character
        Evidence: Appellant's *Daubert* Motion to Exclude the
        Admission of Prejudicial Character Evidence is Denied ...................16

    C.   Appellant's Second Pretrial Objection to Prejudicial Character
        Evidence: Appellant's Motion in *Limine* No. 1 to Exclude the
        Admission of Prejudicial Character Evidence is Denied ...................18

    D.   Appellant's Third Pretrial Objection to Prejudicial Character
        Evidence: Appellant Files a Trial Brief Alerting the District
        Court to The Behemoth's Intention to Introduce Prejudicial
        Character Evidence at Trial in Contravention of FRE 412 ................19

    E.   Appellant's Fourth Pretrial Objection to Prejudicial Character
        Evidence: The Behemoth Fails to File a 412 Motion by the
        Statutory Deadline and Appellant's *ex parte* Application for an
        Order Prohibiting the Admission of 412 Evidence is Denied.............19

    F.   Appellant's Fifth Objection to Prejudicial Character Evidence:
        Appellant Objects at Trial Before the Evidence is Introduced ..........21

    G.   Appellant's Objections at Trial and Summary of
        Admitted Prejudicial Character Evidence ...........................22

    H.   Procedural History Relevant to Appellant's Proposed
        "Based on Sex" Jury Instruction, which was Denied by the
        District Court Notwithstanding The Behemoth's Misstatements
        of Law to the Jury.................................................................27

I.     The Behemoth is Awarded its Costs without the District Court Making a Finding of Frivolity and Notwithstanding that Appellant is a Civil Rights Plaintiff ....................................33

V.    SUMMARY OF THE ARGUMENT ...........................................33

VI.   STANDARD OF REVIEW ........................................................34

VII.  ARGUMENTS ..........................................................................36

A.    The District Court Abused its Discretion in Allowing The Behemoth to Admit Substantial Evidence of Appellant's Sexual Predispositions and Vulgar Speech at Trial, Amounting to a Moral Indictment of Appellant in Contravention of FRE 412............36

B.    The Final Judgment Should be Reversed Because The Behemoth Flouted the Procedural Requirements of Rule 412, Resulting in Intractable and Substantial Prejudice ............................41

C.    The District Court Abused its Discretion in Refusing Plaintiff's Proposed Jury Instruction No. 23 Because The Behemoth's Misstatement of the Law was Uncorrected ........................................44

D.    Appellant's Instruction is Supported by Law and Has Foundation in the Evidence ................................................................48

E.    The District Court Did Not Apply Guiding Ninth Circuit Authority in Awarding The Behemoth Costs and its Legal Analysis is Reviewable *De Novo* .........................................................50

F.    Alternatively, the District Court Abused Its Discretion By Taxing Costs Against Appellant Because of Demonstrable Indigency, Economic Disparity Between the Parties, a Meritorious  Case, and a Risk of a Chilling Effect on Future Civil Rights Litigants .........................................................53

VIII. CONCLUSION...........................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ass'n of Mexican-Am. Educators v. State of California,*
231 F.3d 572 (9th Cir. 2000) ...................................................................... passim

*B.K.B. v. Maui Police Dep't,*
276 F.3d 1091 (9th Cir. 2002) ................................................................... passim

*Barranco v. 3D Sys. Corp.,*
952 F.3d 1122 (9th Cir. 2020) ........................................................................35

*Brown v. Board of Educ.,*
347 U.S. 483, 74 S. Ct. 686 (1954)..................................................................51

*Carr v. Allison Gas Turbine Div. Gen. Motors Corp.,*
32 F.3d 1007 (7th Cir. 1994) ...........................................................................40

*Christiansburg Garment Co. v. E.E.O.C.,*
434 U.S. 412 (1978)................................................................................... 51, 52

*Clare v. Clare,*
982 F.3d 1199 (9th Cir. 2020) ........................................................................34

*Davis v. California Dep't of Corr. & Rehab.,*
484 F. App'x 124 (9th Cir. 2012) ............................................................. passim

*Draper v. Rosario,*
836 F.3d 1072 (9th Cir. 2016) ........................................................... 50, 54, 56

*E.E.O.C. v. Nat'l Educ. Ass'n, Alaska,*
422 F.3d 840 (9th Cir. 2005) .................................................................... 46, 48

*Early v. Keystone Rest. Grp., LLC,*
814 F. App'x 253 (9th Cir. 2020) ........................................................ 50, 51, 52

*Fuller v. Idaho Dep't of Corr.,*
865 F.3d 1154 (9th Cir. 2017) .................................................................. 45, 26

*Galdamez v. Potter,*
415 F.3d 1015 (9th Cir. 2005) ........................................................... 35, 48, 49

*Nichols v. Frank,*
    42 F.3d 503 (9th Cir. 1994) ...............................................................46

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998).............................................................................27

*Pavon v. Swift Transp. Co.,*
    192 F.3d 902 (9th Cir. 1999) ...........................................................35

*Polo-Calderon v. Corporacion Puertorriqueña de Salud,*
    992 F. Supp. 2d 53 (D.P.R. 2014).....................................................37

*Rene v. MGM Grand Hotel, Inc.,*
    305 F.3d 1061 (9th Cir. 2002) .........................................................40

*Sanchez v. City of Santa Ana,*
    936 F.2d 1027 (9th Cir. 1990) .........................................................54

*Schwarz v. Sec'y of Health & Hum. Servs.,*
    73 F.3d 895 (9th Cir. 1995) ...................................................... 35, 51

*Socks-Brunot v. Hirschvogel Inc.,*
    184 F.R.D. 113 (S.D. Ohio 1999)......................................... 39, 40, 43

*Spencer v. Peters,*
    857 F.3d 789 (9th Cir. 2017) ...........................................................35

*Sprint/United Mgmt. Co. v. Mendelsohn,*
    128 S. Ct. 1140 (2008)......................................................................34

*Stanley v. Univ. of S. California,*
    178 F.3d 1069 (9th Cir. 1999) ................................................. passim

*U.S. v. Chang Ru Meng Backman,*
    817 F.3d 662 (9th Cir. 2016) ...........................................................44

*U.S. v. Laursen,*
    847 F.3d 1026 (9th Cir. 2017) .........................................................40

**Statutes**

28 U.S.C. § 1291 ..................................................................................4

42 U.S.C. § 2000 ..................................................................................3

Cal. Bus. & Prof. Code § 17200 .........................................................33

Cal. Gov. Code § 12940 ........................................................................3

**Rules**

Fed. R. Civ. P. 4 ..................................................................................33

Fed. R. Civ. P. 54(d)(1) ............................................................ 34, 50, 52

Fed. R. Evid. 105 ................................................................................44

Fed. R. Evid. 403 ................................................................ 16, 18, 40, 44

Fed. R. Evid. 404 ................................................................................19

Fed. R. Evid. 412 ......................................................................... passim

**Other Authorities**

*Calderon v. Fresenius USA, Inc.*,
   No. CV207869PSGJEMX,
   2022 WL 3012158 (C.D. Cal. Apr. 19, 2022) ....................................54

*Hendon v. California State Senate*,
   No. 21-CV-00505-BAS-MDD,
   2022 WL 345641 (S.D. Cal. Feb. 4, 2022) ........................................27

*Smith v. Ergo Sols., LLC*,
   No. CV 14-382 (JDB),
   2019 WL 3068293 (D.D.C. July 12, 2019) .......................................40

David S. Schwartz, When Is Sex Because of Sex?
   The Causation Problem in Sexual Harassment Law,
   150 U. Pa. L. Rev. 1697 (2002) .....................................................45

# I.    INTRODUCTION

This case alleges that Defendant-Appellee The Behemoth ("The Behemoth" or the "Company"), a video game company that makes games for children, endorsed and protected a pedophile, facilitated pedophilic and sexually explicit media content in the workplace (including violent and explicit descriptions of sex acts with children and male-on-male rape), and failed to remediate a work environment profoundly imbued with sexual and discriminatory misconduct.  Plaintiff-Appellant Robert Cleveland ("Appellant") is a survivor of sex abuse, having been molested as a child by his mother's boyfriend.  He, and others, testified under oath that The Behemoth failed to act notwithstanding repeated complaints to upper management by multiple employees, which he (and a diagnosing forensic psychologist) testified precipitated in him debilitating psychological symptoms and post-traumatic stress resurgence.

This case was always about Appellant's exposure to violent sexual media content in the workplace, facilitated by The Behemoth through its public-facing media platforms and enabled by the Company's relationship with its voiceover actor, Will Stamper ("Stamper").  Appellant's allegations center on exposure to Stamper, Stamper's harassing, pedophilic, and violent sexual messaging (*i.e.*, "*[S]ometimes [I] want to throw a baby up in the air over and over again and let him fall back on my dick when he least expects it*"), and The Behemoth's facilitation of a hostile work environment as the entity with professional power over Appellant, control over

his workplace, and control over The Behemoth's own relationship with Stamper. Nevertheless, the district court allowed, in derogation of the Federal Rules of Evidence ("Fed. R. Evid." or "FRE") and this Circuit's firmly established procedures and analysis for the admission of character evidence in sexual harassment cases, a constant drumbeat of character and morally impugning evidence at trial against ***Appellant***.  The jury was free to consider, among other lurid and prejudicial evidence, a psychiatrist's "clinical" assessment that Appellant was "misogynistic" and "sexist" and "quite active in the use of foul language," Appellant's references to breasts, adult-themed YouTube videos Appellant allegedly viewed on his work computer, Appellant's references to sex and pornography with persons other than Stamper or any manager at The Behemoth, myriad examples of Appellant's use of the "F" word and unspecific foul language—all conspicuously offered to render a morally crude, unsympathetic view of Appellant for the jury.  The Behemoth's motivations were laid bare when its counsel turned to the jury and prefaced: "***Wait. I need to apologize to the jury.  You are going to see some graphic material here.***" This improper moral indictment was not only admitted over counsel's objection but admitted despite that The Behemoth failed to notice the required in-camera hearing under FRE 412(c) and despite Appellant's pretrial *ex parte* application alerting the district court to this procedural failure by The Behemoth.  The results were insidious: the district court was seeing "evidence" of Appellant's sexual predispositions for the

2

first time at trial along with the jury. These errors deprived Appellant of a fair trial and the final judgment should be reversed with remand for a new trial, accordingly.

The district court's errors were further compounded by its failure to give Appellant's proposed jury instruction on the arcane element of "based on sex," a required showing under the antidiscrimination laws at issue. In refusing Appellant's proposed clarifying jury instruction, the district court impliedly endorsed The Behemoth's misstatement of law at trial to suggest Appellant was required to make a showing of gender-based motivation or sexual animus in order to prevail. Finally, the district court failed to apply guiding Ninth Circuit authority in failing to make a finding of frivolity before awarding The Behemoth's costs, and otherwise abused its discretion by inadequately weighing factors the district court should consider before taxing costs against a civil rights plaintiff.

## I.   STATEMENT OF JURISDICTION

This action alleges, *inter alia*, violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*. ("Title VII") and the California Fair Employment and Housing Act, Cal. Gov. Code § 12940, *et seq*. ("FEHA"). The district court thus had jurisdiction because this action alleges violations of the laws of the United States.

On February 2, 2023, Appellant timely filed a notice of appeal from the final judgment and order entered in the district court on January 3, 2023 following a jury

trial (the "Final Judgment"); *see* Appellant's Excerpt of Record ("ER") 1-ER-2-3, and all rulings that were entwined with the Final Judgment or are otherwise necessary to ensure meaningful review. 3-ER-555-557. Thereafter, on May 11, 2023, the district court denied Appellant's motion to retax costs (the "Costs Judgment"). Appellant filed an amended notice of appeal to add the Costs Judgment on May 24, 2023. The Court of Appeals thus has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  STATEMENT OF ISSUES

1.  Under *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002), as amended (Feb. 20, 2002), Fed. R. Evid. 412, 401–404, and other germane law and authority, did the district court abuse its discretion by permitting substantial character evidence and testimony at trial relating to a Title VII/FEHA sexual harassment plaintiff's sexual behaviors and vulgar speech, including: (1) showing the jury multiple videos of adult content the Plaintiff-Appellant allegedly viewed unilaterally on YouTube; (2) showing the jury dozens of expletives and adult-themed conversations Plaintiff-Appellant allegedly participated in with co-workers, where those conversations were not with and did not involve the alleged harasser; and (3) showing the jury dozens of expletives and adult-themed conversations Plaintiff-Appellant allegedly participated in with co-workers, where those conversations were different in subject matter and type than the type of harassing

content to which the Plaintiff-Appellant alleges he was exposed at work (*i.e.,* pedophilia and male-on-male rape, *inter alia*), among other lurid and prejudicial evidence?

2.     Procedurally, did the district court abuse its discretion when it permitted the introduction of the foregoing evidence by the Defendant-Appellee at trial, where: (1) Defendant-Appellee failed to notice or request an in-camera hearing pursuant to Fed. R. Evid. 412(c), and no such hearing was held; and (2) Plaintiff-Appellant filed a motion in *limine* to exclude the evidence, filed an *ex parte* application for an order regarding the Defendant-Appellee's non-compliance with Fed. R. Evid. 412(c) and motion to exclude, presented oral argument prior to trial that the evidence should be excluded, and objected to the evidence at trial, all of which were denied/overruled?

3.     Did the district court err in refusing Plaintiff-Appellant's proposed special jury instruction No. 23 (or similar instruction) explaining the meaning of "based on sex" under Title VII and FEHA, which explained that sexually harassing conduct can be motivated by a number of gender-neutral reasons and a person can be harassed "based on sex" even if members of a different gender are also harassed in the person's workplace, where: (1) Plaintiff-Appellant presented oral argument that, under *Davis v. California Dep't of Corr. & Rehab.*, 484 F. App'x 124, 128 (9th Cir. 2012), sexual harassment can occur even where the conduct is not facially sex or gender specific, particularly where there is evidence of differences in subjective

effects between the genders; (2) Plaintiff-Appellant presented evidence of differences in subjective effects between the genders at trial; and (3) Defendant-Appellee misstated the law at trial to suggest the law requires gender-motivated conduct, including in cross-examination of Plaintiff-Appellant that "You have no knowledge of your male gender being the motivation for any action taken by The Behemoth towards you.  Isn't that right?" over counsel's objection?

4.    Did the district court abuse its discretion in denying Plaintiff-Appellant's motion to retax costs despite Plaintiff-Appellant's financial condition and his status as a civil rights plaintiff, and/or without making a finding of frivolity?

## III.    STATEMENT OF THE CASE

### A.    Relevant Factual Background

"[T]he next time [I] see a kid playing with a fidget spinner [I]'m gonna put my dick in his mouth.  [I]'m just gonna walk up and pull my dick outta the little flap on my jeans and put my dick in his mouth, my penis.  [I] am going to fuck a kid in the mouth with my adult penis."  3-ER-482-483; 2-ER-250.  These were the words of The Behemoth's voiceover actor Will Stamper ("Stamper"), who witnesses described at trial as the celebrated "voice" and "mascot" of The Behemoth.  3-ER-352; 3-ER-454.

The Behemoth is a video game company that makes games for children, ages 13 and up.  3-ER-344; 3-ER-412.  The Company has three owners: John Baez, Dan Paladin, and Tom Fulp.  3-ER-408-410.  It generates between $1–3 million in net income a year and has earned at least $30 million in revenue from just one of its best-selling games.  3-ER-379-380.  The Company's owners chose the name "The Behemoth" for its irony, because, at least at its inception in 2003, The Behemoth was comprised of a small "family" of men.  3-ER-549; 3-ER-413.  Part of that little ironic Behemoth "family" was Stamper, who the Company's owners have known for over 18 years.  3-ER-411.  Stamper wasn't just The Behemoth's "voice actor extraordinaire;" Stamper was and remains a "good friend" and "dear to [the] heart" of The Behemoth's President and Chief Executive Officer, John Baez.  3-ER-376.  He also routinely and publicly describes his interest in sodomizing baby boys and raping children, generally.  2-ER-249, 2-ER-139 ("*[S]ometimes [I] want to throw a baby up in the air over and over again and let him fall back on my dick when he least expects it*.")[1]; *see also* 2-ER-245, 2-ER-247, 2-ER-250, 2-ER-251, 2-ER-252, 2-ER-253, 2-ER-262.

---

[1] Mr. Stamper's testimony on this statement was shown to the jury via video.  3-ER-341.

Appellant is a video game tester and quality assurance analyst who worked for The Behemoth from March 2016 to March 2018, following two bouts of homelessness. 3-ER-484; 2-ER-260; 3-ER-450. Appellant worked in a division of The Behemoth known as The Research Centaur, or "TRC." 2-ER-260. He was repeatedly sexually abused as a child by a man in a relationship with his mother. 3-ER-449. On Appellant's first day of work at The Behemoth, he was handed a pink plush unicorn with a penis-shaped horn emitting a substance mimicking semen. 3-ER-452-455. A tag attached to the doll referred to Stamper. 3-ER-454. Appellant's supervisor, Jay Fernandes, told Appellant and others that the "Penicorn" (as The Behemoth's owners refer to it) was the Company's "HR manager." 3-ER-342-343; 3-ER-453. The "Penicorn" was designed by Stamper nearly 20 years ago, after which Tom Fulp, one of the Company's three owners, commissioned the manufacture of plush dolls based on the design. 2-ER-138. When the doll was placed in Appellant's hand, it immediately triggered memories of specific sexual acts he was forced to perform as a child on an adult man. 3-ER-455; *see* Mot. Transmit Evidence, Exhibit A (Trial Exhibit 532). He testified at trial that being given the doll "awakened . . . the time with Rod and my abuse. And I hadn't had to deal or face that for . . . [my] whole time being alive." 3-ER-456. In his deposition testifying on behalf of the Company, which was played for the jury, John Baez testified that he "loved the penicorn" and that "The Behemoth doesn't know of

anybody else's love for the Penicorn besides John Baez." 3-ER-373; 2-ER-147. The Behemoth issued and required Appellant to sign the Company's employee handbook, which purported to prohibit sexual harassment (which the handbook defined to include "visual conduct such as derogatory and/or sexually-oriented posters, photography, cartoons, drawings, or gestures") by both employees and nonemployees of The Behemoth. 2-ER-255-256. On March 23, 2016, at 1:40 a.m., following his second day of work at The Behemoth, Appellant visited the emergency room and was diagnosed with heart palpitations and anxiety. 3-ER-316. He testified that being given the penis doll "floored him" and caused his anxiety attack, which felt like "impending doom." 3-ER-457-458.

Appellant testified at trial that over the course of his tenure at The Behemoth, he was required—as a function of his job—to access various digital platforms operated or used by The Behemoth, including to "clean up" obscene content. 3-ER-459-479; 2-ER-153-244, 3-ER-302-303. Those platforms included media platforms Steam, Twitter, Discord, and Slack. *Id.* Stamper authored graphic and sexually violent material which Appellant and others testified was published, reposted, or discussed on these mandatory platforms. *Id.*; 3-ER-357-360, 2-ER-245-253, 2-ER-262-267. Much of the material was pedophilic and described sexual acts with children, including an invitation to "[Retweet] if you like putting your penis in kids mouths." *Id.* Other material described male-on-male rape or sex acts such as "off

topic, is it gay to fuck another man?" and sodomizing baby boys. 2-ER-249, 2-ER-252. Evidence at trial showed Appellant and others in their role of "moderating" or cleaning up material on The Behemoth's digital platforms in connection with their job duties—including at the direction of The Behemoth's Community Manager, Megan Lam—which included explicit material authored by Stamper. 3-ER-302-303; 3-ER-345-351, 3-ER-467-468. In his deposition, part of which was shown to the jury for impeachment, John Baez testified under oath that exposure to Stamper's Tweets by The Behemoth's workers did not concern him because it is "part of their job" to observe Stamper's Tweets. 3-ER-374-375; 2-ER-143. Appellant testified that such moderation duties were not disclosed to him prior to his start date. 3-ER-451. According to John Baez at trial, Stamper was not terminated by The Behemoth until eight days after Appellant filed this lawsuit. 3-ER-377-378. Megan Lam testified that Stamper was used to generate business for The Behemoth because of his substantial fan following. 3-ER-390-392.

Witnesses testified at trial that The Behemoth intentionally drove Stamper and Stamper's fans to The Behemoth and The Behemoth's digital platforms that Appellant and others were required to access, including, *inter alia*, encouraging fans to "Come meet . . . Will Stamper," inviting Stamper's substantial fan base to do Q&A's with Stamper on The Behemoth's digital platforms, bringing Stamper to video game conventions where he wore The Behemoth apparel and signed

autographs at The Behemoth's booth, interacting with photos of Stamper's genitals and referencing Stamper within the Company's digital platforms, announcing meet and greets with Stamper on social media, allowing Stamper to author blog posts on The Behemoth's websites, and engaging Stamper to do the voiceover work on the Company's games. 3-ER-361-363; 3-ER-386-402; 3-ER-414-416; 3-ER-419-433. Appellant's coworker, Kevin Price, referred to The Behemoth's official Discord server as "the unofficial fan site for William Stamper." 3-ER-362-363. Witnesses testified that Stamper was so synonymous with The Behemoth because of the foregoing activities that exposure to Stamper, the content he authored, and discussions about Stamper were unavoidable on or through the media platforms they were required to use. 3-ER-352-354; 3-ER-418.

On August 31, 2017, Appellant sent a message to his supervisor, Jay Fernandes, through Slack. 2-ER-245-246. The following are excerpted from Trial Exhibit 37:

> **Appellant**: [I]t only takes 1 reddit thread to blow up and our company becomes flooded with a wave of negative press because we work with Stamper and stamper wants to joke about [having sex with] children. . . Between his use of the N word and now talking about sex with kids, its weird. [Appellant forwarded a Tweet from Stamper reading "buncha fuckin narcs on twitter, you better not be tell the feds and i'm [sic] trying to fuck some kids"].

> **Fernandes**: I'll talk to the owners about it (and thank you for bringing it up). . . . I sent an email but probably won't hear anything until after PAX. . . . it's bad for us both internally and externally. . . . It matters little what the originator thinks about themselves, it matters how it

affects people. . . . including how sexual harassment is handled. . . when you or someone else brings up that an employee is making them uncomfortable, it doesn't really matter what the intent is. . . . Which is how sexual harassment works in HR practice (full circle), where the focus is on impact and not intent.

The same day, Mr. Fernandes emailed John Baez, writing:

" . . . I just happened to see some of the things Stamper has been talking about on Twitter recently, and especially in today's online world it seems. . .wildly inappropriate?. . . . I wanted to bring this up since I have growing concerns and it's also not a great look for people wanting to work here, or people who currently work here, and seeing something like this happening which can make a lot of people uncomfortable. . . . I've also seen some racial oriented things besides this. . . . I guess we'll talk about it when you get back." 2-ER-254.

In his deposition testifying on behalf of the Company, which was played for the jury, John Baez testified that he could not recall whether the Company did anything in response to Fernandes' August 31, 2017 email. 2-ER-145. Mr. Fernandes testified at trial that Mr. Baez never responded. 3-ER-367.

On November 30, 2017, Appellant sent another message to Mr. Fernandes through Slack. 2-ER-247-248. The following are excerpted from Trial Exhibit 38:

**Appellant**: [D]ude. . . [sends link to Stamper's Twitter post "RT if you like putting your penis in kid's mouths."]

**Fernandes**: I complained to a few people about it already but never got a reply so that's sweet.

**Appellant**: . . .[I]t's actually really offensive to me to see anyone in our company talking about kids like this.

**Fernandes**: Same.

**Appellant**: [A]nything . . . with kids sends me in to [a] rage. I hate it.

**Fernandes**: I'm pinging some people about it.

**Appellant**: [T]hanks dude.

**Fernandes**: You want to file an "official complaint" to Behemoth HR?

**Appellant**: Sure but if they fire me you need to help me get another job somewhere . . .

**Fernandes**: I suppose they'd have to fire a few people.

On the same day, Appellant sent an email to Fernandes titled "Holding ourselves to a higher standard on social media." 2-ER-257-259. Appellant's email cited Stamper's "harassment to derogatory remarks against trans people and women to implied pedephilia [sic]," which Appellant "wanted to . . . bring . . . to the company's attention." *Id*. Fernandes forwarded the email to John Baez less than thirty minutes later, noting:

> This is concerning . . . . this is not the first time it has come up and we've had employees at TRC previously share their feelings about similar tweets [from] him in the past and this time around I know a few people [] extremely uncomfortable with this but didn't want to come forward or email to be "named" . . . Bobby had messaged me a bit before sending this as well and was visibly distraught, talking about how offensive it is for anyone to be talking about children that way. . . .

> I'm concerned that this is having a negative effect on our team, since some people at State have also mentioned similar to me in private and it seems like a growing problem. Making people uncomfortable to work here or knowing that someone like that works here and is seemingly able to act how they want is obviously an issue for any team. . . .

> Let me know if you need anything else for now, but I share Bobby and other's views that a lot of this is wildy inappropriate even for our standards. *Id*.

Stamper testified in his deposition, which was shown to the jury, that neither Mr. Baez nor anyone from The Behemoth ever talked to him about his social media. 2-ER-141. John Baez invited Stamper to attend the Company's Christmas party just days after Mr. Fernandes' email because "we didn't want [Stamper] to be lonely." 3-ER-384. Mr. Baez also testified that he visited Stamper at his home in December 2017 and "held his hands just like I held my mother's hands, and tried to really get through to him that these—tweeting like this might be funny to him and maybe a few of his friends, but it's just not helpful to anybody." 3-ER-383. In his deposition testifying on behalf of the Company, which was played for the jury, Mr. Baez testified that Stamper was ultimately fired nearly two years later (8 days after this lawsuit was filed, according to his trial testimony) because he "can't turn in work." 2-ER-148; 3-ER-377-378. The Behemoth's Producer, Ian Moreno, testified at trial that Stamper was in part fired because the Company did not "want to associate with" the "offensive material in [Stamper]'s personal Twitter." 3-ER-536. Appellant testified that, approximately one week after he sent the November 30, 2017 email reporting Stamper, Mr. Baez met with Appellant and expressed to Appellant that "this is what happens when the company gets too big." 3-ER-481.

In his deposition testifying on behalf of the Company, which was played for the jury, Mr. Baez testified that he has fired at least one person on a pretextual subterfuge. 2-ER-148. Nine weeks and one day after Appellant's November 30,

2017 email reporting Stamper to Company management, The Behemoth fired Appellant. 3-ER-385. Mr. Baez testified on behalf of the Company in his deposition, which was shown to the jury, that Appellant was fired because "[h]e had no special skills beyond testing that were useful to us." 2-ER-146. Mr. Paladin, one of The Behemoth's three owners, testified at trial that the reason for letting Appellant go was because he "didn't have any positive feedback from [Jay Fernandes]." 3-ER-417. Mr. Fernandes, however, testified at trial that he had relayed to Mr. Baez that Appellant was "really good at . . . testing skills, and wanted to do design." 3-ER-370. In a written memo to management just weeks before Appellant's November 30, 2017 email, Mr. Moreno characterized Appellant as "proactive" with "self-drive" and data-backed ideas. 2-ER-304-305.

At trial, Dr. Ellen Stein, Ph.D., a forensic and clinical psychologist of over 25 years, testified that Appellant had experienced a reactivation of post-traumatic stress disorder as a result of his work environment at The Behemoth, including via his exposure to material describing sex acts with baby boys and Appellant's feelings that Stamper was "an omnipresent figure in the company." 3-ER-442-443.

**B.  Appellant's First Pretrial Objection to Prejudicial Character Evidence: Appellant's *Daubert* Motion to Exclude the Admission of Prejudicial Character Evidence is Denied**

On March 4, 2022, Appellant filed a motion to exclude The Behemoth from making use of the testimony and report of psychiatrist Dr. Dominick Addario, M.D., The Behemoth's proffered expert in this case, under *Daubert v. Merrell Dow Pharmaceuticals* and Fed. R. Evid. 403 and 412. 2-ER-114-136.

Dr. Addario offered myriad references to Appellant's use of expletives and sexual predispositions, "references[s] to breasts," along with specious counterfactual conclusions and opinions on Appellant's morality, subjective state of mind, and motives in his expert report, rebuttal report, and deposition, including: (1) that Appellant had demonstrated "significant ***emotional overlay*** to his feelings of having been exposed to a negative environment during his employment with The Behemoth"; (2) "The fact that [Plaintiff] is comfortable with explicit sexual comments and language and flippant types of communication would point that ***he's not naïve, he's not innocent***, and ***he's not as vulnerable as he would like others to see him as***"; (3) "[Plaintiff] blamed a consultant, ***whom he in fact had limited to no actual contact with*** in regard to his work demands"; (4) "So ***there were definitely boundaries that Mr. Cleveland may have been crossing to look at Stamper material that were not part of his job***"; and (5) ". . . this Examiner has reviewed . . . ***important***

*electronic communications by Mr. Cleveland that show misogynistic attitudes and foul language*." 3-ER-321-326; 2-ER-150; 2-ER-152; 3-ER-327-328.

A "Findings" section on page 34 of Dr. Addario's expert report followed 33 pages of a narrative recapitulation of deposition transcripts, medical records, and his 2.5-hour exam of Appellant. 3-ER-323. Despite that this case is about the pedophilic content and sexual misconduct to which The Behemoth allegedly exposed Appellant at work, Dr. Addario's "Findings" contain no analysis of that content or misconduct (or its theoretical impact on Appellant, a sex abuse survivor) whatsoever. Instead, that section is devoted nearly entirely to Dr. Addario's review of "extensive messages from Mr. Cleveland to various people," which included a laundry list of messages Appellant allegedly authored on his personal Twitter account and a work communication platform. These messages included a "provocative" poem containing language such as "you're the f—n' man," expletives, and sexual discussions such as "my ex asked me once 'would u mind if I f—d my coworker?'" 3-ER-324-325; 3-ER-327.

On page 37 of Dr. Addario's expert report, Dr. Addario summarily concludes:

> *Mr. Cleveland's own comments to various persons as noted in social media postings demonstrate that he was quite active in the use of foul language, derogatory statements, sexist comments, and dealing with very sexual issues*. They do not demonstrate an individual who, as he describes himself, was impervious and avoidant of such because of trauma in his earlier background. . . .*I see no evidence of a psychiatric disorder as a consequence of the employment at The Behemoth. He had disagreements with the employer and claimed harassment* as a

consequence of materials that he was allegedly exposed to during the course of his employment, which is apparently in debate. 3-ER-326.

The district court denied Appellant's *Daubert* motion in full on October 6, 2022, finding, *inter alia*, that Dr. Addario's testimony "may be helpful to the trier of fact in determining whether and to what extent Plaintiff suffered emotional distress and whether such distress was caused by Defendant." 2-ER-93-94. Dr. Addario was permitted to testify at trial and his expert report and rebuttal report were admitted as Trial Exhibits 515 and 516.

### C. Appellant's Second Pretrial Objection to Prejudicial Character Evidence: Appellant's Motion in *Limine* No. 1 to Exclude the Admission of Prejudicial Character Evidence is Denied

Also on March 4, 2022, Appellant filed a motion in *limine* No. 1 to exclude evidence of Appellant's sexual behavior, lifestyle, coarse language, and/or predisposition under Fed. R. Evid. 403, 404, and 412. 2-ER-98-113. In support of that motion, Appellant attached a summary list of the character evidence sought to be excluded, which included specific links to YouTube and specific electronic communications cited in the Addario Report. 2-ER-90-92.

On October 6, 2022, the district court denied Appellant's motion in *limine* No. 1 on the basis that "the categories of evidence Plaintiff seeks to exclude are overly broad." 1-ER-5-6.

**D.** **Appellant's Third Pretrial Objection to Prejudicial Character Evidence: Appellant Files a Trial Brief Alerting the District Court to The Behemoth's Intention to Introduce Prejudicial Character Evidence at Trial in Contravention of FRE 412**

On November 3, 2022, Appellant filed a trial brief with the district court. 2-ER-63-88. Appellant expressly objected to any attempt by The Behemoth to introduce evidence at trial in contravention of FRE 412 and the principles enunciated by this Circuit in *B.K.B.*, 276 F.3d at 1104, including, *inter alia*, (1) Dr. Addario's expert and rebuttal reports (which were later admitted as Trial Exhibits 515 and 516); (2) purported communications between Appellant and co-workers (not between Appellant and Stamper) involving various expletives and coarse language; and (3) YouTube videos reflecting certain adult or coarse content that Appellant allegedly viewed on his work computer. 2-ER-63-88.

**E.** **Appellant's Fourth Pretrial Objection to Prejudicial Character Evidence: The Behemoth Fails to File a 412 Motion by the Statutory Deadline and Appellant's *ex parte* Application for an Order Prohibiting the Admission of 412 Evidence is Denied**

On November 22, 2022, Appellant filed an *ex parte* application for an order on The Behemoth's non-compliance with Fed. R. Evid. 412 and a motion to exclude, on the basis that, *inter alia*, The Behemoth did not file a motion for the introduction of evidence expressly proscribed by FRE 412 within 14 days of trial (making the deadline November 21, 2022) as required by FRE 412(c). 2-ER-28-46. At a pretrial status conference on December 2, 2022, the district court noted that "the Court

agrees with the defendant that the evidence at issue *is not the type of evidence Rule 412 aims to safeguard*. . .”  3-ER-330.

Appellant's counsel asked to be heard on the issue and objected extensively at the hearing, excerpted below:

> MS. O'CONNOR: We really view this, Your Honor, as a salient and critical pretrial consideration, because the type of evidence at issue is substantially prejudicial . . . It's the very type of evidence that frequently gives rise to mistrials in this circuit and others. And we are concerned that Defendant, which did not file its 412 statutory noticed in-camera hearing and the appropriate motion, will elicit testimony and introduce argument and evidence in front of the jury. Now, I can object at trial, but . . . the jury will hear this prejudicial character evidence before Your Honor rules on it. And that is a penalty to Plaintiff as a result of Defendant's failure and missing its own deadline under 412. 412 does apply.
>
> The Ninth Circuit has made very clear—that's the *B.K.B. vs. Maui Police Department* case . . . that . . . 412 applies to civil sexual harassment lawsuits. . . .412 has a stringent and very different standard than your pro forma 403 prejudicial-versus-probative analysis. First, it shifts the burden to the party seeking to admit this evidence to prove that its probative value substantially outweighs the danger of harm to the plaintiff. That's why Plaintiff is invited to attend the in-camera hearing for privacy interests. And they must notice that in-camera hearing two weeks prior to trial. . .
>
> Your Honor, we are in a prejudicial position because this evidence, which is different in kind from the harassing conduct which my client alleges which is largely pedophilic, is largely sexually violent, is—is different in kind from the type that they're trying to advance. And even if it was the same, Your Honor, even if it was analogous, the Ninth Circuit and other circuit courts have held that this should have been noticed in connection with the 412 hearing. So we are now in a prejudicial position, and we're being penalized for Defendant's own failure. And I thank Your Honor for your time. 3-ER-331.

Following counsel's objections, the district court declined to preview the evidence that The Behemoth intended to show the jury, holding that "[t]he Court stands by its ruling that ***412 is not applicable in this case***." 3-ER-338.

A minute order denying Appellant's *ex parte* motion was entered on December 16, 2022. 1-ER-4.

### F. Appellant's Fifth Objection to Prejudicial Character Evidence: Appellant Objects at Trial Before the Evidence is Introduced

On Day 5 of trial and outside the presence of the jury, Appellant's counsel objected—for the fifth time—to the introduction by The Behemoth of prejudicial character evidence:

> MS. O'CONNOR: Yes.  Ms. Chung, Your Honor, indicated on Thursday shortly before we adjourned that she intends to introduce character evidence that we previously moved to exclude under Federal Rule of Evidence 412, 402, 403, and 404.  And I just want to preserve and make the record and reiterate our objection to that evidence for the reasons stated in our 412 motion, our *Daubert* motion, and our Motion in *Limine* No. 1. . . . This would be character evidence relating to Mr. Cleveland's use of profanity or sexual discussions.  3-ER-446.

> THE COURT:  Okay.  I believe I already ruled on that.  Okay. So that will—I'll allow that to be admitted. . . . I believe it's the—***the use of his language at work*** as well as, I believe it's ***e-mails that he shared at work, those I found to be admissible*** . . . . I'm sorry . . . ***[t]he Slack messages***.  3-ER-446-448.

### G. Appellant's Objections at Trial and Summary of Admitted Prejudicial Character Evidence

At trial, and over Appellant's objections, myriad evidence was admitted describing Appellant's use of unspecific foul language, one-on-one Slack communications[2] between Appellant and a colleague about his dating life, Appellant's use of the word "cunt" to describe a politician, and videos on the Internet that Appellant allegedly shared or viewed in one-on-one electronic communications with a colleague (which The Behemoth's counsel preceded with "***Wait. I need to apologize to the jury. You are going to see some graphic material here***" and which the district court was seeing for the first time with the jury). 3-ER-499. These communications were not with Will Stamper, or pedophilic in nature, or the same in kind as the material by which Appellant testified he was offended ("Q: Mr. Cleveland, was Stamper's conduct offensive to you, as a man? A: Yes it was. . . .***Tweeted a lot about raping male children***; and forced oral sodomy and forced rape." 3-ER-528; "***I do believe I have a pretty liberal sense of humor, except for when it comes to raping children*** . . ." 3-ER-518).

Representative examples of the character evidence admitted by the district court include:

---

[2] Slack is a workplace communication platform that was utilized by The Behemoth's workers. 2-ER-260-261.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, regarding comedy specials by comedian Dave Chappelle, which included foul language and references to transgender persons.  3-ER-488-491; 3-ER-306-308.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, using the words "ass cunts" to describe racist people.  3-ER-492-493; 3-ER-312-315.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, which included Appellant sending an adult-natured video which he testified he encountered in connection with his moderation duties.  The video, which shows men discussing women and women's breasts, along with various sex acts, was shown to the jury.  3-ER-493-495; Mot. Transmit Evidence, Exhibit B (Trial Exhibit 335).

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, which included Appellant sending a video featuring a man using expletives and the appropriation of Japanese culture.  3-ER-495-496; Mot. Transmit Evidence, Exhibit C (Trial Exhibit 337).

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, which included Appellant sending a video featuring a man using expletives and a nude man traversing a street in Philadelphia. 3-ER-496-499; Mot. Transmit Evidence, Exhibit D (Trial Exhibit 348). The Behemoth's counsel turned to the jury before showing the video and announced, "Wait. I need to apologize to the jury. You are going to see some graphic material here." 3-ER-499.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, discussing the lyrics of a song by the band Tool, which included numerous expletives and the phrase "hooker with a penis." 3-ER-500-501; 2-ER-272-276.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, referring to "PH," which The Behemoth's counsel testified is short for "porn hub" despite Appellant not recalling the context of the conversation. 3-ER-501-503.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, referring to a date he went on with a woman, which included Appellant's statement that he would "have sex" with the woman but not date her, and that he

24

hadn't "fucked since 2014." 3-ER-503-505; 3-ER-287-291. Notably, Appellant testified that his colleague with whom he was having this conversation, Lucia Aldana, was also a "friend." 3-ER-505.

- A Slack exchange between Appellant and Ms. Aldana, which The Behemoth's counsel argumentatively preceded with "we have *yet another* message-in-the-workplace chat between you and Lucia Aldana," in which Ms. Aldana discussed her premenstrual symptoms with Appellant and Appellant wrote that he would "play with myself and kill myself" if he "swapped to being a woman out of nowhere." 3-ER-505-509; 2-ER-276-279.

- A Slack exchange between Appellant and his coworker Jan Enevoldsen, with whom Appellant testified he had a "pretty close friendship with," discussing American views on sex and "sex-positive" commercials in Europe and relaying a sexual experience involving two women. 3-ER-510-515; Mot. Transmit Evidence, Exhibit E (Trial Exhibit 386). The Behemoth's counsel also played for the jury a video hyperlinked within this communication string, which featured an advertisement for beer and implied group sex.

- A Slack exchange between Appellant and Ms. Aldana about karma, during which Appellant used the "F" word and referred to "a long sex session with Russian hookers." 3-ER-515-516.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, which included Appellant forwarding an article referring to "sex robots." 3-ER-516-517; 3-ER-292.

- Questions to Appellant during his cross-examination by The Behemoth relating to whether he wrote about porn stars in Slack communications with his colleague. 3-ER-517-518.

- Appellant's use of the phrase "fucking cunt," and "dumb cunt" on Slack in reference to a politician. 3-ER-59-520; 3-ER-293-301; 3-ER-521-523; 3-ER-309-311.

- A Slack exchange between Appellant and Ms. Aldana, during which Appellant referred to his aunt as a "dumb bitch." 3-ER-523; 3-ER-286.

- Appellant's one-on-one private Slack discussion with a colleague, who was not Stamper or any manager at The Behemoth, during which Appellant wrote "There are two Bobby's. And sometimes internal Bobby yells and an external Bobby smiles; only at work though. Ha, ha." 3-ER-526-527; 2-ER-268-269.

**H.** **Procedural History Relevant to Appellant's Proposed "Based on Sex" Jury Instruction, which was Denied by the District Court Notwithstanding The Behemoth's Misstatements of Law to the Jury**

Sexual harassment under Title VII and FEHA requires a showing of conduct "because of . . . sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 76 (1998); *Hendon v. California State Senate*, No. 21-CV-00505-BAS-MDD, 2022 WL 345641, at *7 (S.D. Cal. Feb. 4, 2022).

On November 3, 2022, and considering the arcaneness of the phrase "because of . . . sex," Appellant proposed a special jury instruction to aid and clarify the jury's understanding (Proposed Instruction No. 23 "Based on Sex Explained"). 2-ER-48-52.

The Behemoth also submitted a proposed jury instruction for Title VII hostile work environment, No. 50, which Appellant opposed for its proposed syntax "because he is male" because it assigned too much [misleading] emphasis on the motivation of the harassment, where case law and statutory language emphasize the impact of the harassment. 2-ER-54-59. Appellant also opposed The Behemoth's proposed jury instruction No. 53 ("Because of Sex" Defined) for its misstatement of law. 2-ER-60-61.

In Appellant's trial brief filed on November 3, 2022, Appellant further proffered:

In sum, (1) Plaintiff's Proposed Instruction No. 23 ("Based on Sex Explained") . . . [is] critically important for juror clarity and should be adopted in order to properly convey the state of the law "based on sex"; and (2) The Behemoth should not be permitted to introduce any theme, theory, or jury instruction which unfairly and improperly suggests that Plaintiff must prove The Behemoth's action(s), or failure to act, was motivated by Plaintiff's gender. 2-ER-79.

On Day 5 of trial, outside the presence of the jury, Appellant's counsel addressed the issue further with the Court, noting that this Circuit rejects an "equal opportunity" harasser defense and that "based on sex" can be proven through evidence of differences in subjective responses between the genders under *Davis*, 484 F. App'x at 124. 3-ER-529-532. Appellant's counsel noted that "Mr. Cleveland, as a reasonable man, was offended by penis dolls, exposure to material at work which describes sodomy, raping little boys, and observing his male colleague getting groped by an open pedophile, among other conduct. That was his subjective reaction as a man." 3-ER-530.

On December 13, 2022, day 6 of trial, the district court declined to give Appellant's proposed jury instruction No. 23. 3-ER-540. Appellant's counsel objected: "We would preserve our objection to [] not including number 23 on the bases that, one, the Ninth Circuit decision in *Davis v. California* indicates that subjective differences between genders is evidence of based on sex. That motivation is not a requirement in the Ninth Circuit. And, secondly, that the Ninth Circuit

squarely rejects the equal opportunity harasser defense.  And in an avoidance of confusion, we would urge and propose that number 23 be adopted."  3-ER-541.

At trial, Appellant introduced evidence of differences between the genders in the subjective effects on and responses by The Behemoth's workers to the alleged misconduct, summarized and excerpted below:

<u>Testimony by Appellant, a male</u>:

Q: Mr. Cleveland, was Stamper's conduct offensive to you, as a man?

A: Yes, it was.  3-ER-528.

Q: The first time that you reported it, what prompted you to send that message?

A: It was dealing with raping children and some objectionable pedophilia stuff that was just—just awful.  3-ER-480.

<u>Testimony by Mr. Price, a male</u>:

Q: Prior to sitting on your lap, had you seen any of the tweets Mr. Stamper had made about homosexuality and raping children?

A: Yes.

Q: Did the fact that you had seen those tweets make you feel more uncomfortable with him sitting on your lap?

A: Yeah, definitely.  Super disgusting.  3-ER-355-356.

Q: Aside from this—or even during this Christmas party or any other time, were there any times where you were around Mr. Stamper that he did or say anything that ***you found equally offensive***?

. . .

A: Yeah. . . .  3-ER-356-357.

29

Testimony from Mr. Fernandes, a male:

Q: So, here, he's referring to his August 31st complaint to your knowledge.  Right?

A: Yes.

Q: Okay.  And he says, "It's actually really offensive to me to see anyone in our company talking about kids like this."  And you write back, "Same."  ***Because you also found it really offensive, right***?

A: ***I did***.  3-ER-368.

Q: And you also found it offensive?  The Tweet that was being forwarded to you?

A: ***I did***.  3-ER-369.

Testimony from Mr. Fulp, a male:

Q: And you said—you just used the term outrageous.  Can you describe—what kind of tweet did you consider outrageous?

A: Like he did—you know, there's like a week that he did a bunch of, like, pedophilic jokes.  Which, you know, I don't like that kind of humor.  So that was feeling like he was just sort of—you know, what are you doing?

Q: Why didn't you like that type of humor?

A: It's just not the—it's gross.  It's like—he thinks it's shocking.  Like—he thinks like it's a shocking joke, but it's more like gross.  3-ER-434-435.

Testimony from Mr. Zedaker, a male:

Q: Do you recall hearing about any of Stamper's pedophilic tweets during your entire time at TRC?

A: I do recall hearing about Stamper's tweets that were, again, in awful taste; that were ***very offensive*** in content.

Q: And that included sex with children?

30

A: Possibly.  3-ER-436-437.

Q: Mr. Zedaker, the tweets that—by Mr. Stamper that Mr. Cleveland raised in the workplace, which of those, if any, did you consider offensive?

A: Uhm—I mean, probably more than a—more than a few of them. Again, I don't remember sort of specific times or the specific tweets that were brought up. But I would say probably any of the ones that Cleveland brought up were probably very—offensive.  3-ER-438-439.

Testimony from Mr. Moreno, a male:

Q: And why doesn't The Behemoth work with Mr. Stamper anymore?

A: Well, because of the development on Pit People.  Sadly, he's unreliable.  And also, on—in his personal life, there's obviously some offensive material in his personal Twitter that is, you know, we don't want to associate with.  3-ER-536.

Q: When did you stop following Mr. Stamper?

A: After QueenStamper, it was—clearly, there was this pattern of putting out offensive content and as—and consequently being banned from Twitter by Twitter.  So I just stopped.  I didn't want to watch the show.  3-ER-537.

On the other hand, neither of the female witnesses testified they were offended

by the content or conduct.

Testimony from Ms. Lam, a female:

Q: But my question is were you ever concerned that Mr. Stamper would make people at The Behemoth uncomfortable to work there?  So that's a yes or no.

A: No.  3-ER-403.

Q: Do you recall Mr. Stamper engaging any—in any conduct that you found sexually offensive at a trade show?

A: No.  3-ER-405.

<u>Testimony from Ms. Aldana, a female:</u>

Q: What were your thoughts about the penicorn, generally?

A: It was just a plush to me.

Q: Were you offended?

A: No.  3-ER-535.

At trial, counsel for The Behemoth repeatedly misstated the law to the jury to suggest the law required Appellant prove gender-motivated conduct, *inter alia*:

> "Q: You have no knowledge of ***your male gender being the motivation for any action taken by The Behemoth towards you***.  Isn't that right?
>
> Appellant's counsel: **Objection.  Misstates the law** and argumentative.
>
> District court: Overruled."  3-ER-524-525.

During closing argument, Appellant's counsel articulated Appellant's theory of "based on sex" for the jury:

> There might be differences in the way that men and women subjectively experience sexual misconduct.  In other words, was Bobby offended because, as a man, something about him being a man caused him to experience that environment differently?  Did ejaculating penis dolls and Will Stamper describing sodomizing baby boys make him uncomfortable as a man?  3-ER-548.

The district court ultimately gave Jury Instruction No. 32 ("Work Environment Harassment"), without a special or supplemental instruction explaining the meaning of "based on his sex" or "because he was a man."  3-ER-544.

**I.    The Behemoth is Awarded its Costs without the District Court Making a Finding of Frivolity and Notwithstanding that Appellant is a Civil Rights Plaintiff**

On December 15, 2022, after hearing the foregoing moral indictment of Appellant, a misstatement of law, and no clarifying jury instruction on "because of sex," the jury reached a defense verdict on all claims, excepting Appellant's claim for violations of Cal. Bus. & Prof. Code § 17200, *et seq*., which Plaintiff voluntarily dismissed.

On January 17, 2023, Defendant filed a Bill of Costs pursuant to Fed. R. Civ. P. 4(d).  2-ER-26-27.  Appellant filed objections on January 27, 2023.  2-ER-8-25. On February 22, 2023, the Clerk of the Court entered an order taxing costs against Appellant in the amount of $49,860.91.  Mot. RJN, Exhibit 1.  On March 1, 2023, Appellant filed a motion to retax costs, which Defendant opposed on March 20, 2023.  Mot. RJN, Exhibits 2, 4.  Appellant filed a reply on March 27, 2023.  Mot. RJN, Exhibit 5.  The district court denied Appellant's motion to retax costs on May 11, 2023.  Mot. RJN, Exhibit 7.  The district court's order, *inter alia*, rejected Appellant's argument that there must be a finding of frivolity for defendants to recover costs under Title VII and FEHA.  *Id*.

**IV.    SUMMARY OF THE ARGUMENT**

Appellant's case should be remanded for a new trial because the district court abused its discretion in two material ways.  First, the district court abused its

33

discretion in permitting the admission of myriad prejudicial character evidence designed to morally impugn the Appellant, a civil rights sexual harassment plaintiff, which was neither probative of his claims nor similar in kind to the misconduct alleged. This improper moral indictment was not only admitted over counsel's objection but admitted despite that The Behemoth failed to notice the required in-camera hearing under FRE 412(c) and notwithstanding Appellant's pretrial *ex parte* application alerting the district court of The Behemoth's procedural failure.

Second, the district court abused its discretion in refusing Appellant's proposed jury instruction No. 23, the exclusion of which impliedly endorsed The Behemoth's misstatement of the law, unfairly and inadequately covered the issues presented, and misled the jury resulting in prejudicial error.

The district court also erroneously denied Appellant's motion to retax costs by failing to apply guiding Ninth Circuit authority and make a finding of frivolity. Alternatively, the district court abused discretion because Appellant rebutted the presumption in Fed. R. Civ. P. 54(d)(1) considering the factors the district court should weigh before taxing costs against a Title VII plaintiff.

## V.   STANDARD OF REVIEW

Evidentiary rulings are reviewed for an abuse of discretion. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S. Ct. 1140, 1145 (2008); *Clare v. Clare*, 982 F.3d 1199, 1201 (9th Cir. 2020) (reversing district court's exclusion of declaration

because it was an abuse of discretion). This Court may reverse based on an erroneous evidentiary ruling where it concludes that the district court abused its discretion and that the error was prejudicial. *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020). "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 907 (9th Cir. 1999). "A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005). The Court reviews "a district court's formulation of civil jury instructions for an abuse of discretion," but considers "*de novo* whether the challenged instruction correctly states the law." *Spencer v. Peters*, 857 F.3d 789, 797 (9th Cir. 2017).

This Circuit reviews "the district court's denial of a motion to re-tax costs for an abuse of discretion." *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1079 (9th Cir. 1999). However, "any elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable *de novo*." *Schwarz v. Sec'y of Health & Hum. Servs.*, 73 F.3d 895, 900 (9th Cir. 1995). A district court abuses discretion when its award "is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Id.*

# VI.   ARGUMENTS

## A.   The District Court Abused its Discretion in Allowing The Behemoth to Admit Substantial Evidence of Appellant's Sexual Predispositions and Vulgar Speech at Trial, Amounting to a Moral Indictment of Appellant in Contravention of FRE 412

In civil actions alleging sexual misconduct, and with limited exceptions, Fed. R. Evid. 412 ("Rule 412") forecloses the admission of evidence: "(1) [] offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition."  Fed. R. Evid. 412(a).  Rule 412 is intended to broadly shield the plaintiff from stereotypical thinking and *also prohibits the admission of a plaintiff's "speech" or "lifestyle"*:

> The rule has been amended to also exclude all other evidence relating to an alleged victim of sexual misconduct that is offered to prove a sexual predisposition.  This amendment is designed to exclude evidence that does not directly refer to sexual activities or thoughts but that the proponent believes may have a sexual connotation for the factfinder. Admission of such evidence would contravene Rule 412's objectives of shielding the alleged victim from potential embarrassment and safeguarding the victim against stereotypical thinking.  Consequently, unless the (b)(2) exception is satisfied, evidence such as that relating to **the alleged victim's mode of dress, speech, or life-style will not be admissible**.

Advisory Committee's Note to 1994 Amendment, Rule 412(a).

In a civil case, the district court may only admit evidence offered to prove a victim's sexual behavior or sexual predisposition if the proponent shows that "its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party."  Rule 412(b)(2); *see also* Advisory Committee's Note

to 1994 Amendment, Fed. R. Evid. 412(b); *Polo-Calderon v. Corporacion Puertorriqueña de Salud*, 992 F. Supp. 2d 53, 54–55 (D.P.R. 2014) ("The Court finds no defendable reason for allowing evidence at trial regarding [plaintiff's] . . . sexual preferences, family dynamics regarding his sexuality, dating history, and any relationships or communications with other men . . . [the cited examples] . . . . are 'precisely the types of intrusive generalized questions about past, private, consensual sexual conduct that courts readily have found marginally (if at all) probative to sexual-harassment claims, highly prejudicial and likely to harm the plaintiff.'").

The Behemoth's prolix drumbeat of "evidence" at trial of Appellant's foul-language-laden references to comedian Dave Chappelle, use of the word "cunt" to describe a politician or racist people, one-on-one discussions about his sex life with a trusted colleague who was not Stamper, citations to song lyrics containing the word "hooker," adult themed-videos featuring discussions of female breasts and adult sex acts, references to Appellant's own aunt as a "dumb bitch," and other lurid and substantially prejudicial evidence are expressly the type proscribed under FRE 412. § IV.G, *supra*. That information amounted, categorically, to an egregious indictment of Appellant's morality for which intractable juror bias was all but certain. The Behemoth's motivations were laid bare by counsel's own prefatory

indoctrination: "***Wait. I need to apologize to the jury. You are going to see some graphic material here.***"  3-ER-499.

At the outset, the district court's finding that "[FRE] 412 is not applicable in this case" (3-ER-338) contradicts this Circuit's clear enunciation that "Rule 412's coverage extends over sexual harassment lawsuits."  *B.K.B.*, 276 F.3d at 1104 (excluding evidence of plaintiff's discussions about sex with her co-worker in workplace sexual harassment action under Title VII).  Nor is this intentionally pejorative "evidence" probative of whether the alleged harassment was "welcome" by Appellant, since this Circuit has held that—even where character evidence is ultimately allowed under the intensive scrutiny of Rule 412—only "***specific instances of sexual behavior by the [plaintiff] with respect to the person accused of the sexual misconduct offered by the [plaintiff] to prove consent***" is permissible.  *Id.*, at 1105.

In other words, for example, YouTube videos Appellant allegedly viewed on his work computer are not probative of whether he welcomed (1) Stamper's harassing and pedophilic media content which Appellant alleges daily permeated his work environment, (2) The Behemoth's facilitation of such content by virtue of requiring Appellant to clean it up on certain of its servers and by intentionally promoting its relationship with Stamper, (3) Appellant's supervisor, a person with professional power over Appellant, referring to an ejaculating penis doll as his "HR

38

manager," among other alleged misconduct. *Id*. ("The defendants offered Becraft's testimony in order to impugn Plaintiff's moral character and presumably also to establish that sexual advances by [the alleged harasser] and sexual misconduct at the workplace were not unwelcome. . . . However, Becraft's testimony failed to recount any admissions by Plaintiff regarding [the alleged harasser's] advances . . . .").

Thus, coarse discussions Appellant may have engaged in, or references to sex he may have made, with non-supervisory employees or co-workers who were not Stamper: (1) are not probative where Appellant did not allege such employees harassed him, and (2) do not meet the presumption of prejudice under FRE 412. *Socks-Brunot v. Hirschvogel Inc.*, 184 F.R.D. 113, 123–24 (S.D. Ohio 1999) ("[T]he evidence described above should not have been admitted, even in the absence of objection by the plaintiff. The plaintiff's claims of sexual harassment allegedly perpetrated by [] Bentz involved specific, explicit sexual speech. The defense was [] within legal bounds . . . to show that the plaintiff herself may have initiated explicit sexual speech in her conversations with Bentz. . . . [but] included much more, including [] highly personal sexual conversations to **which Bentz was not a party** . . . and [] generalized, undifferentiated testimony that plaintiff used profanity in the workplace.") (granting motion for new trial on the basis that the defendants violated Rule 412 by "present[ing] the picture of a sexually aggressive, foul-mouthed, bad mother and wife, none of which was relevant [] to the context of

[her] . . . claims . . . ") (emphasis added); *Carr v. Allison Gas Turbine Div. Gen. Motors Corp.*, 32 F.3d 1007 (7th Cir. 1994) (plaintiff's use of the words "f——head" and "d——head" did not invite harassment); *U.S. v. Laursen*, 847 F.3d 1026, 1035 (9th Cir. 2017) (finding that the district court did not abuse its discretion in excluding evidence under Rule 412); *Smith v. Ergo Sols., LLC*, No. CV 14-382 (JDB), 2019 WL 3068293, at *4 (D.D.C. July 12, 2019) ("The emails and related testimony add very little to the issues that the jury must decide; essentially, this evidence asks the jury to conclude that sending crude videos by email to one or more people at her place of employment—but, notably, not to her alleged harasser—made it more likely that Smith welcomed sexual advances from Brownlee. Such a meager showing of probative value, paired with the clear prejudicial effect of presenting evidence of Smith's sexual predisposition, leads the Court to conclude that defendants have not carried their burden under Rule 412(b)(2).").

Nor was the underlying nature of the admitted material relevant to the type by which Appellant testified he was offended, and the admitted material likewise should "not have been admitted even under the more liberal standard set forth in Federal Rule of Evidence 403." 3-ER-518; *Socks-Brunot*, 184 F.R.D. at 124 ("The quantum of such inadmissible evidence combined with the highly prejudicial content of the testimony convinces this Court that the plaintiff was denied a fair trial.").

The district court thus abused its discretion in allowing, over counsel's repeated pretrial and midtrial objections, the admission of evidence offered "in order to impugn [Appellant's] moral character" where that evidence was not relevant to "the welcomeness of [the] harassing conduct." *B.K.B.,* 276 F.3d at 1105. And, because of the incendiary nature of the admitted character evidence—including references to Appellant's "sexual practices" and use of unspecific foul language—it was "impossible to dispel the effect . . . ." *Id.,* at 1106. Thus, the error was substantially prejudicial and the Final Judgment should be reversed and remanded for a new trial.

**B.** **The Final Judgment Should be Reversed Because The Behemoth Flouted the Procedural Requirements of Rule 412, Resulting in Intractable and Substantial Prejudice**

This Court has long held that "[u]nless the trial court permits an accommodation for good cause, a party seeking to introduce evidence covered by Rule 412 must file a motion, detailing the evidence and its purpose, no later than 14 days before the commencement of trial. Fed. R. Evid. 412(c)(1)(A)." *B.K.B.,* 276 F.3d at 1104.

The Behemoth "flouted these procedural guidelines" when it failed to file a Rule 412 motion and give Appellant "a right to attend and be heard" by its statutory deadline of November 21, 2022. *Id.,* at 1105. The result was insidious: the jury was free to immediately consider sexually laden videos and myriad examples of sexually

charged, vulgar discourse and commentary by Appellant without any opportunity for the Court to determine—for each proffered exhibit or testimony—whether it surmounted the high presumption of prejudice under FRE 412. *Id.*, at 1104–07 (finding that the defendant's lawyers acted in bad faith when they intentionally violated Rule 412's procedural requirements where the evidence had been, as here, the subject of other pretrial motions, affirming the award of sanctions and remanding for a new trial). This conduct was wholly violative of the purpose of the FRE 412, which is to "safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." *Id.,* at 1104.

The district court's finding that the evidence "is not the type of evidence Rule 412 aims to safeguard," therefore obviating the notice and hearing requirements mandated by FRE 412, was an abuse of discretion and clear error. 3-ER-330. Dr. Addario's Expert Report, admitted as Trial Exhibit 515, conspicuously defined The Behemoth's objectives in admitting the evidence: "These entries, as well as others, demonstrate Mr. Cleveland being quite active in the use of foul language, derogatory statements, sexist comments, and dealing with very sexual issues, such as various parts of the body. They do not demonstrate an individual who, as he describes himself, was impervious and avoidant of such because of trauma in his

42

earlier background." 3-ER-325. In other words, the value to The Behemoth of these exhibits and testimony was in their ability to evoke "a sexual connotation for the factfinder." Advisory Committee's Note to 1994 Amendment, Fed. R. Evid. 412.

*Socks-Brunot* illustrates the dangers involved in proceeding without complying with Rule 412's strict procedural requirements. Like in the case at bar, "[p]rior to trial, the defendant made no attempt to comply with Federal Rule of Evidence 412(c)(2) and sought no pre-trial determination as to whether evidence relating to sexual speech or conduct of the plaintiff was admissible." *Id*., 184 F.R.D. at 119. The defendant maintained that Rule 412 was inapplicable to any evidence relating to "unwelcomeness," on the theory that "evidence relating to any prior sexual conduct which [the plaintiff] discussed at work [was] admissible, not as evidence of sexual predisposition or other sexual behavior, but as direct evidence that [the plaintiff] welcomed or even created the sexually-charged environment." *Id*. Nevertheless, the court allowed the defendant to offer limited evidence of sexual conversations in the workplace in which the plaintiff participated. *Id*., at 120. In the end, the trial "included a large amount of prejudicial evidence which the jury should not have heard and which denied the plaintiff the right to a fair trial," entitling the plaintiff to relief in the form of a new trial. *Id*., at 124. The court acknowledged that its decision to allow the defendant to offer evidence in violation of Rule 412(c) was "erroneous," and in considering the purpose of Rule 412 thereafter, held:

Evidence tending to prove both prior sexual conduct of the plaintiff and workplace conversations of the plaintiff is covered by Rule 412. Generally, evidence admissible for one purpose but inadmissible for another may be heard by a jury, pursuant to Federal Rule of Evidence 105. The general rule is inapplicable with regard to evidence covered by Rule 412. Under Rule 412, procedures must be followed, including *in camera* proceedings which require pre-trial resolution of the admissibility issues; the Rule also provides a fundamentally different balancing test as to admissibility than that provided by the general relevance standard found in Federal Rule of Evidence 403. *Id.*, at 119.

This Circuit has held that exclusion of evidence at trial is an appropriate sanction for a party's failure to comply with the procedural and specificity requirements under FRE 412. *U.S. v. Chang Ru Meng Backman*, 817 F.3d 662 (9th Cir. 2016) (affirming district court's decision to exclude 412 evidence at trial based on procedural failures). Because the district court "must conduct a hearing in camera and afford the [plaintiff] and parties a right to attend and be heard," the district court's admission of the evidence at trial notwithstanding The Behemoth's procedural failure amounted to an abuse of discretion. *B.K.B.*, 276 F.3d at 1104. For the reasons discussed *infra*, the admission of the evidence was likewise intractably prejudicial.

## C. The District Court Abused its Discretion in Refusing Plaintiff's Proposed Jury Instruction No. 23 Because The Behemoth's Misstatement of the Law was Uncorrected

A claim for hostile work environment under both Title VII and FEHA requires a showing of "sex-based" harassment. *See* 2-ER-96-97. The element is legally nuanced and arcane. Because of the complexities of the analysis, and because many

of the facts and circumstances germane to this case do not involve prototypical direct sexual harassment, Appellant sought to clarify the meaning of "sex-based" or "based on sex" through proposed jury instruction No. 23 ("Based on Sex Explained"). Put simply: the question to the jury was not whether The Behemoth was *motivated* by the fact that Appellant was male when it effected a hostile environment under FEHA and Title VII. The proper question was whether, as a reasonable man, Appellant would have considered the work environment hostile because of his subjective response as a man. *Davis*, 484 F. App'x at 128. It is a distinction with a critical difference.

First, the legal emphasis of the "based on sex" analysis is on the impact of the harassment, not the motivation. While a harasser's motivation is not irrelevant to the hostile work environment analysis (and is often the focus of cases where a harasser's motivation is clear, such as in cases of direct sexual proposition), the legal emphasis examines the effect on the harasser as a member of that gender— irrespective of the harasser's motivations. This is because "a harasser may not act with specific intent to keep [one gender] out of the workplace, but may engage in intentional conduct that has that effect, albeit motivated (on a level closer to consciousness) by sexual interest, misogyny, personal vendetta, misguided humor, or boredom . . ." David S. Schwartz, When Is Sex Because of Sex? The Causation Problem in Sexual Harassment Law, 150 U. Pa. L. Rev. 1697, 1718 (2002); *Fuller*

*v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1164 n.10 (9th Cir. 2017) (in order to establish a Title VII hostile work environment claim, "it is not necessary that [an employer] either intended to discriminate or knew that its conduct created a hostile work environment"). This Circuit further enunciated this principle when it held that the premise of a hostile work environment claim "is that the conditions of the work environment have been made hostile 'because of . . . sex,'" and that "why the harassment was perpetrated (sexual interest? misogyny? personal vendetta? misguided humor? boredom?) is beside the point." *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1066 (9th Cir. 2002) (internal citations omitted); *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994) (rejecting a separate "because of sex" element and holding that "sexual harassment is ordinarily based on sex. What else could it be based on?") (abrogated on other grounds).

There are likewise multiple evidentiary pathways for proving discriminatory harassment "because of sex," which can be gender neutral. *E.E.O.C. v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 845 (9th Cir. 2005). "[E]vidence of differences in subjective effects (along with, of course, evidence of differences in objective quality and quantity) is relevant to determining whether or not men and women were treated differently, even where the conduct is not facially sex– or gender-specific." *Davis*, 484 F. App'x at 128.

In *Davis*, the plaintiff "complained to her supervisors" of "exhibitionist masturbation by inmates," but "she not only received no assistance but was accused of provoking the behavior." *Id.*, at 128. The plaintiff "was told that she was overreacting and that such behavior was to be expected in a male prison." *Id.* The Court reversed the district court's grant of summary judgment, finding that "[t]he district court erred in endorsing [the defendants'] argument that [Mandel's] conduct was not sexual harassment because he consistently abused men and women alike." *Id.* This Court reasoned, "to the extent that her male co-workers were also targets of Mandel's offensive behavior, there is *no evidence* suggesting that they had *similar subjective responses* to that behavior." *Id* (emphasis added).

Here, as in *Davis*, Appellant proffered myriad evidence of differences in "subjective responses to [the same] behavior" between the genders of The Behemoth's workers. *Id.* It was thus error for the district court to "endorse[] the defendants' argument that" motivation and sexual animus are required for Plaintiff to prevail, where The Behemoth conspicuously misstated the law to suggest to the jury that Appellant was required to prove motivation and/or gender animus: "You have no knowledge of your male gender being the ***motivation*** for any action taken by The Behemoth towards you. Isn't that right?" 3-ER-524-525. This theme, touted throughout the trial by The Behemoth, violates *Davis* and the line of cases holding

47

that there need not be "a specific intent to discriminate against" men "or to target" the harassed as a man. *E.E.O.C.*, 422 F.3d at 844–45.

The Behemoth's thematic misstatements of law—directly inconsistent with the law in this Circuit—required clarification from the district court in order to avoid juror confusion and misanalysis. The district court's failure to give Appellant's proposed jury instruction No. 23 impliedly endorsed The Behemoth's misstatement of the law at trial and constituted an abuse of discretion, accordingly.

### D. Appellant's Instruction is Supported by Law and Has Foundation in the Evidence

"A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Galdamez*, 415 F.3d at 1015. The law permits Appellant to prove discriminatory harassment because of sex through a showing of "how men and women differed in the way that they subjectively experienced that treatment." *Davis*, 484 F. App'x at 127.

In *Galdamez*, the district court "refused to instruct the jury on the Postal Service's duty to investigate and remedy actionable harassment by customers and community members." 415 F.3d at 1022. The district court reasoned, in part, that the plaintiff was not entitled to the instruction because the defendant was not "motivated by discriminatory animus" and "the evidence did not support the requested instruction." *Id.* This Court reversed and concluded: "The district court erred as a matter of both law and fact in refusing the instruction. . . . the district court

applied incorrect law . . . based on its belief that Galdamez had to prove that discriminatory animus motivated the Postal Service's failure to act" and "the evidence was sufficient to support jury instructions on both a hostile work environment and employer liability." *Id.,* at 1022–23.

Here, as in *Galdamez*, Appellant's theory of sexual harassment based on sex is "supported by law." 415 F.3d at 1022. As delivered by Appellant's counsel in closing arguments, there are "differences in the way that men and women subjectively experience sexual misconduct. In other words, was Bobby offended because, as a man, something about him being a man caused him to experience that environment differently? Did ejaculating penis dolls and Will Stamper describing sodomizing baby boys make him uncomfortable as a man?" 3-ER-548. That theory is squarely supported by *Davis*. 484 F. App'x at 127.

Moreover, and like *Galdamez*, Appellant's theory of sexual harassment was buttressed by its "foundation in the evidence." 415 F.3d at 1022. The record is replete with evidence of differences in subjective effects between the genders at The Behemoth among its workers. 3-ER-548; 3-ER-528 (Robert Cleveland); 3-ER-368-369, 3-ER-366 (Jay Fernandes); 3-ER-480 (Robert Cleveland); 3-ER-355-357 (Kevin Price); 3-ER-434-435 (Tom Fulp); 3-ER-436-439 (Mason Zedaker); 3-ER-536-537 (Ian Moreno); 3-ER-403 (*compare* Megan Lam); 3-ER-535 (Lucia Aldana); 3-ER-404-405 (Megan Lam)

Accordingly, Appellant was "entitled" to proposed jury instruction No. 23 because his theory of sexual harassment based on sex is supported by the law and buttressed by a foundation in the evidence. *Galdamez,* 415 F.3d at 1022. The district court thus abused its discretion in refusing proposed jury instruction No. 23.

### E. The District Court Did Not Apply Guiding Ninth Circuit Authority in Awarding The Behemoth Costs and its Legal Analysis is Reviewable *De Novo*

Fed. R. Civ. P. 54(d)(1) ("the Rule") provides that unless "a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees— should be allowed to the prevailing party." Although "the [R]ule creates a presumption in favor of awarding costs to a prevailing party," *Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 591 (9th Cir. 2000), the district court's "discretion is not unlimited." *Id*; *Draper v. Rosario*, 836 F.3d 1072, 1088 (9th Cir. 2016) (finding award of costs was abuse of discretion).

The district court's discretion in the civil rights context is limited. *See Ass'n of Mexican-Am. Educators*, 231 F.3d at 591. This Court has held that a district court errs "by awarding attorneys' fees and costs" to "a prevailing Title VII or FEHA defendant" without "*a finding that the plaintiff's action was frivolous, unreasonable, or without foundation . . . .*" *See Early v. Keystone Rest. Grp.*, LLC, 814 F. App'x 253, 257 (9th Cir. 2020) (emphasis added). Even if a district court is not required to make such a finding, "[d]istrict courts should consider" certain factors before taxing

costs to the non-prevailing party that function to rebut the Rule's presumption. *Stanley*, 178 F.3d at 1079–80. These factors include "the losing party's limited financial resources," "economic disparity [between plaintiff and defendant]," "the chilling effect . . . on future civil rights litigants," and "Plaintiff's case, although unsuccessful, had some merit." *Ass'n of Mexican-Am. Educators*, 231 F.3d at 592.

The policy underpinning a finding of frivolity against a civil rights plaintiff is a sound one: "to promote the vigorous enforcement of the provisions of Title VII." *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978). The district court may not "engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Id.* When the district court does "not make such a finding or explain the basis for its award," the district court's order granting costs should be vacated and remanded. *Early*, 814 F. App'x at 257. The "imposition of such high costs on losing civil rights plaintiffs of modest means may chill civil rights litigation in this area." *Stanley*, 178 F.3d at 1080. "Without civil rights litigants who are willing to test the boundaries of our laws, we would not have made much of the progress that has occurred in this nation since *Brown v. Board of Educ.*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954)." *Id.*

The district court failed to apply guiding authority from this Court and the "legal analysis" for its order is "reviewable *de novo*." *See Schwarz*, 73 F.3d at 900.

Saliently, the district court reasoned: "the Court acknowledges California's requirement that there be a finding of frivolity for defendants to recover costs in defending alleged FEHA violations. . . [ho]wever, <u>absent guiding Ninth Circuit authority</u>, the Court declines to apply *Williams* to the instant action." Mot. RJN, Exhibit 7 (ECF 189) (emphasis added).

There is, however, guiding authority from this Circuit on analogous facts and law. In *Early*, plaintiff presented claims under Title VII and FEHA, as here. *See* 814 F. App'x at 256. One of the two defendants prevailed on summary judgment as to all claims and submitted Rule 54 Bill of Costs, as The Behemoth did here. *See id.* The district court awarded "fees and costs" without making a finding of frivolity. *Id.,* at 257. This Court vacated and remanded the district court's order, reasoning: the "district court did not make any such findings or explain the basis for its award to Sonic, nor does the record reveal a reasonable basis for concluding that Early's claims against Sonic were frivolous, groundless, unreasonable, or vexatious." *Id.* Accordingly, "we vacate and remand the order granting Sonic ***fees and costs***." *Id.*

As in *Early*, the district court was required to make "a finding that the plaintiff's action was frivolous, unreasonable, or without foundation" prior to awarding The Behemoth its costs. *Id.* The district court's failure to make such a finding plainly undermines the policy of promoting "the vigorous enforcement of the provisions of Title VII," (*Christiansburg Garment Co.,* 434 U.S. at 422), because

of the tendency of an imposition of costs to "chill civil rights litigation in this area." *Stanley*, 178 F.3d at 1080. The district court's order granting "fees and costs" should thus be vacated and remanded. *Id.*

### F. Alternatively, the District Court Abused Its Discretion By Taxing Costs Against Appellant Because of Demonstrable Indigency, Economic Disparity Between the Parties, a Meritorious Case, and a Risk of a Chilling Effect on Future Civil Rights Litigants

The Costs Judgment awards The Behemoth—a Company that generates between $1–$3 million in net income a year—an amount representing more than 115% of Appellant's net income.[3] Even if the district court was not required to make a finding of frivolity, as *Early* prescribes, "district courts should consider" certain factors before taxing costs to the non-prevailing party that operate to rebut the Rule's presumption. *Stanley*, 178 F.3d at 1079–80. These include (1) "the losing party's limited financial resources," (2) "economic disparity [between the parties]," (3) "Plaintiffs' case, although unsuccessful, had some merit," and (4) "the chilling effect . . . on future civil rights litigants." *Ass'n of Mexican-Am. Educators*, 231 F.3d at 592.

First, "[d]istrict courts should consider the financial resources of the plaintiff and the amount of costs in civil rights cases." *Stanley*, 178 F.3d at 1079. Appellant's "argument that payment of the costs would render [him] indigent is compelling." *Id.*

---

[3] 3-ER-379-380; Mot. RJN, Exhibits 3, 6.

Second, "economic disparity between the parties" is an "appropriate reason for denying costs" especially when "[t]here is no comparison between" Appellant's limited resources and those of The Behemoth's. *Draper*, 836 F.3d at 1087–89. Third, it is appropriate to deny costs where "[Appellant]'s case, although unsuccessful, had some merit." *Ass'n of Mexican-Am. Educators*, 231 F.3d at 592. The Behemoth did not file a motion to dismiss or summary judgment on a single of Appellant's claims, instead choosing to litigate this case for nearly three years and submit every single one of Appellant's non-equitable claims to the jury. *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1041–42 (9th Cir. 1990) ("[D]enials of motions to dismiss and summary judgment may suggest that a plaintiff's claims are not without merit"); *Calderon v. Fresenius USA, Inc.*, No. CV207869PSGJEMX, 2022 WL 3012158, at *1 (C.D. Cal. Apr. 19, 2022) (denying prevailing defendant's award of fees and costs in FEHA action because the plaintiff's claims were not frivolous, and noting that the defendant's failure to file any dispositive motions operated as indicia that the plaintiff's claims were not frivolous). Finally, courts properly consider whether "the imposition of such high costs on losing civil rights plaintiffs of modest means may chill civil rights litigation in this area." *Stanley*, 178 F.3d at 1080. Taxing costs to an unsuccessful plaintiff in a civil rights case risks "the regrettable effect of discouraging potential plaintiffs from bringing such cases at all." *Ass'n of Mexican-Am. Educators*, 231 F.3d at 593.

In *Stanley*, a Title IX and FEHA action, the district court awarded the prevailing defendant $46,710.97 in costs. 178 F.3d at 1079–80. This Court held that "the district court abused its discretion in failing to re-tax costs awarded to defendants" both because plaintiff "would be rendered indigent should [he] be forced to pay $46,710.97" and because of the palpable risk of chilling future civil rights litigation. *Id.* Similarly, in *Draper*, which was also a civil rights action, this Court held that "because several factors weigh heavily against a large cost award in this case, and severe injustice would result from such an award, the district court abused its discretion in taxing costs of $3,018.35 against Draper." 836 F.3d at 1089. Germanely, this Court noted that the plaintiff had "virtually no resources," "no checking or savings account," and "no assets." *Id.*

*Ass'n of Mexican-Am. Educators* is further edifying. There, this Court opined that "the district court did not abuse its discretion by refusing to award costs to Defendants," 231 F.3d at 593, noting, *inter alia*, that although "Plaintiffs have not prevailed in this action, their claims are not without merit." This Court further reiterated the fundamental risk underscored by *Stanley* of a "regrettable effect of discouraging potential plaintiffs from bringing such cases at all." *Id.*

The foregoing factors discussed at length in *Stanley*, *Draper*, and *Ass'n of Mexican-Am. Educators* cut heavily against the imposition of costs against Appellant. The Costs Judgment totals $49,860.91. Appellant has limited financial

resources and taxing costs will most certainly render him indigent as a father of a young child with no assets making $31/hour. He has no college degree or investments. Appellant's total wealth, as reflected in his checking and savings accounts, is $1,293.80. Mot. RJN, Exhibits 3, 5, 6, 7. As in *Draper*, there is significant economic disparity between Appellant and Defendant. *See* 836 F.3d at 1086. Whereas Appellant has "virtually no resources," "no checking or savings account," and "no assets," The Behemoth generates between $1 million to $3 million in net income a year and has generated at least $30 million in revenue from a single game. 3-ER-379-380. Finally, as in *Ass'n of Mexican-Am. Educators*, Appellant's "claims are not without merit" as evidenced by The Behemoth's lack of filing a single dispositive motion in this case. 231 F.3d at 593. The district court here too should have "refused to award costs" based on the propulsive inequities at play and for the real risk of precipitating a "chilling effect on future" sexual harassment litigants. *Id.,* at 592–93. As in *Stanley* and *Draper*, "the district court [thus] abused its discretion in failing to re-tax costs awarded to defendants." *Stanley*, F.3d at 1079–80; *Draper*, 836 F.3d at 1086.

## VII.   CONCLUSION

For the foregoing reasons, Appellant respectfully requests that the Final Judgment be reversed and remanded for a new trial, and that the Costs Judgment be vacated.

Dated: June 28, 2023              JOHNSON FISTEL, LLP

By:  */s/ Frank J. Johnson*
Frank J. Johnson
Kristen O'Connor
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
kristeno@johnsonfistel.com
frankj@johnsonfistel.com
*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  23-55108 (L), 23-55462

I am the attorney or self-represented party.

**This brief contains 13,426 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XX] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  */s/ Frank J. Johnson*  **Date** June 28, 2023

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

**9th Cir. Case Number(s)**  23-55108 (L), 23-55462

The undersigned attorney or self-represented party states the following:

[XX]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  /s/ Frank J. Johnson          **Date** June 28, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2023, I electronically served the foregoing

to the parties and/or counsel via electronic mail to the recipients listed in the service

list below:

SCHOR VOGELZANG & CHUNG LLP
Lisa Hird Chung (SBN 246766)
Lisa@svclegal.com
2170 Fourth Avenue
San Diego, CA 92101
Telephone: 619.906.2400
Facsimile: 619.906.2401

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
Kendra J. Hall (SBN 166836)
kendra.hall@procopio.com
525 B Street, Suite 2200,
San Diego, CA 92101
Telephone: 619.525.3836
Facsimile: 619.398.0136

Dated: June 28, 2023                    JOHNSON FISTEL, LLP

                                        By:  */s/ Frank J. Johnson*
                                        Frank J. Johnson
                                        frankj@johnsonfistel.com
                                        *Counsel for Plaintiff-Appellant*